# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

**BEAU LEDOUX**       *    **CIVIL ACTION**

        *

**VERSUS**        *    **NO.:** _____ **SEC.:** _____

        *

**TIM HOOPER, Warden**    *    **MAGISTRATE:** _____

**Louisiana State Penitentiary**   *

        *    **JUDGE:** _____

## MEMORANDUM IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS PURSUANT
## TO TITLE 28 U.S.C. SECTION 2254

**MAY IT PLEASE THE COURT:**

NOW INTO COURT, comes Pro Se Petitioner Beau Ledoux, who respectfully submits this memorandum in support of his petition for writ of habeas corpus, and requests that the law and argument contained herein be considered in this matter.

## GROUNDS FOR RELIEF

This petition for writ of habeas corpus is filed pursuant to 28 U.S.C. § 2254. Petitioner is in the custody of respondent pursuant to a state court judgment of conviction that was obtained in violation of the Constitution of the United States.

In particular, Petitioner represents that:

1. **Petitioner Was Denied His Right To Suppress His Inculpatory Statements.**

2. **Petitioner's Rights Were Violated When Court Denied The Motion For New Trial.**

3. **Petitioner's Constitutional Rights Were Violated When He Received Ineffective Assistance Of Counsel In Violation Of The 6th Amendment To The United States Constitution.**

1

4.   **Confession Obtained Through Fear, Threats And Promises Which Violated The 5th And 14th Amendments To The United States Constitution Due Process Clause.**

Confession Was Involuntary, Given Only Through Fear From Threats Made By St. Tammany Parish Detectives, Along With The Premises That Rebutted Those Threats.

5.   **Bias And Prejudice Juror Was Allowed To Cast Vote, And Hindered A Fair And Constitutional Verdict From Jury, Violating 5th And 14th Amendments.**

Petitioner's Right To Challenge His Conviction And Sentence Were Violated When Petitioner Does Not Have His Complete Record.

6.   **Petitioner's 14th Amendment Due Process Right To Stand Trial While Legally Incompetent Was Violated.**

## WRIT GRANT STATEMENT

Petitioner's federal habeas should be granted pursuant to 28 U.S.C. § 2254(d) for the following reasons: there has been a state court adjudication of all the issues presented in this petition; the issues in question involve federal law; the issues were adjudicated in formal state court proceedings; and the adjudication resulted in a decision that was contrary to clearly established federal law under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. As discussed below, this petition is timely filed within the delays allowed by law.

## STATEMENT OF THE CASE

Appellant, Beau Matthew Ledoux, was charged by the State with five counts of violating R.S. 14:44, Aggravated Kidnapping; five counts of violating R.S. 14:64, Armed Robbery with a Firearm; and one count of violating R.S. 14:43.1, Sexual Battery. The trial court heard Appellant's motions for discovery, to suppress evidence, and to suppress

inculpatory statements on March 6, 2014. At that time, Appellant's discovery motion was satisfied, while his motion to suppress inculpatory statements was denied by the trial court.

The State severed the sexual battery charge prior to the commencement of trial on May 12, 2014. Appellant was tried on the remaining counts and convicted on five counts of violating R.S. 14:44, Aggravated Kidnapping; four counts of violating 14:64, Armed Robbery with a Firearm; and one count of attempting to violate 14:64, Armed Robbery with a Firearm. Appellant's motion for new trial on grounds that his inculpatory statements were admitted in error was denied by the trial court on June 19, 2014. Appellant was sentenced on June 19, 2014 to five terms of life imprisonment as to his convictions for violating R.S. 14:44, Aggravated Kidnapping. Appellant was sentenced on July 17, 2014, following the filing of a multiple offender bill and adjudication, to sixty-years of imprisonment as to each of his convictions of violating R.S. 14:64, Armed Robbery with a Firearm; and to thirty-five years of imprisonment as to his conviction of attempting to violate R.S. 14:64, Attempted Armed Robbery with a Firearm.

### Timeliness of Application:

This Application is properly before this Court as Petitioner was convicted in the 22nd Judicial District Court, Parish of St. Tammany, State of Louisiana on May 12, 2014.

On April 24, 2015, the Louisiana First Circuit Court of Appeal affirmed Petitioner's conviction and sentence on direct appeal. *State v. Ledoux*, No. 2014 KA 1365 (unpublished decision). The Louisiana Supreme Court denied relief on May 20, 2016. *State v. Ledoux*, 191 So.3d 1064.

3

Petitioner's conviction became final for the purpose of the Anti-Terrorism and Effective Death Penalty Act on August 20, 2016, after the 90 day period for seeking relief in the United States Supreme Court expired. *Roberts v. Cockrell*, 319 F.3d 690 (5th Cir. 2003).

Petitioner timely filed his *Application for Post Conviction Relief* into the trial court on April 8, 2018, within one year of the affirmation of his conviction and sentence, preserving both his state post-conviction rights and the federal habeas deadlines established by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244. The trial court denied relief on July 9, 2020. Petitioner filed a notice of intent on July 20, 2020.

Petitioner timely sought writs in the Louisiana First Circuit Court of Appeal on August 3, 2020. The Louisiana First Circuit Court of Appeal denied Petitioner relief on March 2, 2021.

Petitioner timely sought writs in the Louisiana Supreme Court. The Louisiana Supreme Court denied Petitioner relief on September 27, 2021. Petitioner received the ruling of the Louisiana Supreme Court on or about September 29, 2021, through the Louisiana State Penitentiary legal mail delivery system, signing for same in accordance with penitentiary rules and procedure.

Petitioner now files this Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody and Memorandum in Support, by delivering same to the Classification Officer Assigned to his Unit, receiving receipt for same in accordance with penitentiary rules and procedures and therefore, this application is timely and proper before this Honorable Court for its consideration.

4

## STATEMENT OF FACTS

Mr. Ledoux's inculpatory statements were not given freely and voluntarily, but rather they were given under the influence of fear, duress, and intimidation, menaces, threats, inducements, and promises. Mr. Ledoux was arrested and isolated in an interrogation room, handcuffed to a chair, until upwards of twelve hours after his arrest. (R. 160). Thereafter, Mr. Ledoux was subjected to interrogation tactics specifically designed to overcome his will not to incriminate himself. Mr. Ledoux was interrogated by two Detectives for nearly an hour without admitting any involvement or knowledge of the crimes at issue. (R. 155, MS-1). Mr. Ledoux then spent approximately one and a half hours smoking cigarettes and negotiating term of giving an inculpatory statement with officers outside of the building. (R. 152, 164-67). Finally, Mr. Ledoux returned to the interrogation room, where his inculpatory statement was audio-visually recorded. (R. 167).

The first stage of Mr. Ledoux's interrogation, conducted by Detective Rippol and Sergeant Vitter, after Mr. Ledoux was in a position of duress by being isolated for upwards of twelve hours, intimidated Mr. Ledoux and placed him in fear of not only facing his own incarceration for life, but also of his brother, girlfriend, and cousin facing lengthy terms of imprisonment, as well as, his child ending up in custody of the State. (R. 139-42, MS-1).

Thereafter, Mr. Ledoux was allowed to go outside to smoke. (R. 163). While outside, multiple officers communicated with Mr. Ledoux. (R. 164) Mr. Ledoux was induced to give inculpatory statements in exchange for his brother, girlfriend, and cousin being allowed to leave the complex, as well as the promise that he face no more than five years in jail. (R. 163-

67). Mr. Ledoux was, in fact, allowed to witness his brother, girlfriend (escorted by a female officer), and cousin leave the law enforcement complex. (R. 155, 165). Only Detective Lumiet testified on behalf of the State to rebut Mr. Ledoux's allegations as to what occurred outside the building. Other officers, including Sergeant Vitter, who introduced inducements to Mr. Ledoux, and the female officer who escorted his girlfriend, were not called by the State to rebut Mr. Ledoux's allegations as to what occurred outside the building.

After Mr. Ledoux's will to not inculpate himself had been broken, Mr. Ledoux returned to the interrogation room where he made inculpatory statements induced by the interrogation tactics employed by multiple members of the St. Tammany Parish Sheriff's Office. (R. 167).

### *Direct Appeal Claims*

## CLAIM NO. 1

### The Trial Court Erred By Denying Mr. Ledoux's Motion To Suppress His Inculpatory Statements.

## LAW AND ARGUMENT

It is well settled that confessions obtained by "any direct or implied promises, however slight, [or] by the extension of any improper influence, are involuntary and inadmissible as a matter of constitutional law." *Bram v. United States*, 168 U.S. 532, 542-543 (1897). Thus, any self-inculpatory statement sought to be introduced into evidence by the state must be shown beyond a reasonable doubt to have been given freely and voluntarily, and not under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. R.S. 15:451, La. C.Cr.P. Art. 703, *State v. Ragsdale*, 187 So.2d 427, 431 (La. 1966).

Mr. Ledoux's inculpatory statements were not given freely and voluntarily, but rather they were given under the influence of fear, duress, intimidation, menaces, threats, inducements, and promises. Mr. Ledoux was arrested and isolated in an interrogation room, handcuffed to a chair, until upwards of twelve hours after his arrest. (R. 160). Thereafter, Mr. Ledoux was subjected to interrogation tactics specifically designed to overcome his will not to incriminate himself. Mr. Ledoux was interrogated by two Detectives for nearly an hour without admitting any involvement or knowledge of the crimes at issue. (R. 155, MS-1). Mr. Ledoux then spent approximately one and a half hours smoking cigarettes and negotiating terms of giving an inculpatory statement with officers outside of the building. (R. 152, 164-67). Finally, Mr. Ledoux returned to the interrogation room, where his inculpatory statement was audio-visually recorded. (R. 167).

The first stage of Mr. Ledoux's interrogation, conducted by Detective Rippol and Sergeant Vitter, after Mr. Ledoux was in a position of duress by being isolated for upwards of twelve hours, intimidated Mr. Ledoux and placed him in fear of not only facing his own incarceration for life, but also of his brother, girlfriend, and cousin facing lengthy terms of imprisonment, as well as, his child ending up in custody of the State. (R. 139-42, MS-1). Inducements to alleviate those fears were presented to Mr. Ledoux by Sergeant Vitter, who did not testify. (R. 139, 142, MS-1). At the end of this segment of Mr. Ledoux's interrogation, after Sergeant Vitter had departed, Mr. Ledoux began an attempt to secure those inducements from Detective Rippol. (R. 139, MS-1).

Thereafter, Mr. Ledoux was allowed to go outside to smoke. (R. 163). While outside,

multiple officers communicated with Mr. Ledoux. (R. 164). Mr. Ledoux was induced to give inculpatory statements in exchange for his brother, girlfriend, and cousin being allowed to leave the complex, as well as the promise that he would face not more than five years in jail. (R. 163-67). Mr. Ledoux was, in fact, allowed to witness his brother, girlfriend (escorted by a female officer), and cousin leave. (R. 155, 165). Only Detective Lumiet testified on behalf of the State to contradict Mr. Ledoux's allegations as to what occurred outside the building. Other officers, including Sergeant Vitter, who introduced inducements to Mr. Ledoux, and the female officer who escorted his girlfriend, were not called by the State to rebut Mr. Ledoux's allegations as to what occurred outside the building.

After Mr. Ledoux's will to not inculpate himself had been broken, Mr. Ledoux returned to the interrogation room where he made inculpatory statements induced by the interrogation tactics employed by multiple members of the St. Tammany Parish Sheriff's Office. (R. 167).

"The admissibility of a confession is in the first instance a question for the trial judge and his conclusions on the credibility and weight of the testimony relating to the voluntary nature of the statement will not be overturned unless they are not supported by the evidence." *State v. Jackson*, 414 So.2d 310, 312 (La. 1982). Although the decision of the trial judge as to whether the state has met their burden is entitled to great weight, "a reviewing court cannot avoid its responsibility to examine the record to be certain that the State has fully borne its heavy burden of proof in these cases." *State v. Peters*, 315 So.2d 678, 681 (La. 1975). When such a review is made, the states of mind, not only of interrogating officers, but also of the defendant, are highly relevant to determining whether inducements were calculated, under the

8

circumstances of the particular case, to induce a confession. *State v. Nucio*, 454 So.2d 93, 103 (La. 1984) overruled on other grounds as stated in *State v. Johnson*, 664 So.2d 94, 101 (La. 1995).

A review of the testimony and evidence submitted on this issue, even when viewed in the light most favorable to the State, does not amount to an affirmative showing beyond a reasonable doubt that Mr. Ledoux's inculpatory statements were given freely and voluntarily. In *Peters*, 315 So.2d at 682-83, the Court succinctly stated:

> "If defendant's proof was false, it was within the power of the State to offer testimony contradicting the specific claim that his physical condition was altered after the interrogation and to explain how he incurred his injuries. As in the cases earlier discussed, we hold that, under all the facts before us, the State has not upheld its burden of proof because it failed to rebut specifically the testimony of defendant's witnesses when it presumably could have and thereby afforded the trial judge a better opportunity to decide this crucial issue."

In this case, the State did not call Sergeant Vitter, who first introduced inducements to confess into the mind of Mr. Ledoux, and who could have been one of the officers who further coerced Mr. Ledoux while outside, to rebut Mr. Ledoux's allegations. Nor did the State call the female officer who escorted Mr. Ledoux's girlfriend from the complex. In light of these circumstances, and considering the totality of the circumstances, even undder strict review giving discretion to the trial judge's determinations of credibility and weight of evidence, the evidence on the record does not support a finding that the State affirmatively showed beyond a reasonable doubt, that Mr. Ledoux's inculpatory statements were freely and voluntarily given and not the product of fear, duress, intimidation, menaces, threats, inducements, or promises.

9

The trial court's denial of Mr. Ledoux's motion to suppress, and the admission of his inculpatory statement at trial, were therefore in error.

## CLAIM NO. 2

### The Trial Court Abused Its Discretion By Denying Mr. Ledoux's Motion For New Trial.

#### LAW AND ARGUMENT

La. C.Cr.P. Art. 851(2) requires that the trial court grant a motion for new trial when, "[t]he trial court's ruling on a written motion or an objection made during the proceedings, shows prejudicial error." Such relief is "based in the supposition that injustice has been done the defendant." La. C.Cr.P. Art. 851.

Mr. Ledoux filed a written motion for new trial citing prejudicial error caused by the trial court's ruling on his motion to suppress as grounds therefor. (R. 108). Such prejudicial error is shown by the reasons set forth above. However, the trial court denied Mr. Ledoux's motion for new trial. (R. 27).

A trial court's determination of a motion for new trial based upon La. C.Cr.P. Art. 851(2) is reviewed for abuse of discretion. *State v. Thomas*, 2009-1319, p. 7 (La. App. 4th Cir. 06/19/13); *State v. Hollier*, 2009-1084, p. 12 (La. App. 3rd Cir. 4/7/10), 37 So.3d 466, 475; *State v. Davis*, 06-402, p. 11 (La. App. 5th Cir. 11/28/06), 947 So.2d 48, 55.

Here, for the same reasons set forth above, the trial court abused its discretion in denying Mr. Ledoux's motion for new trial, because the evidence does not support an affirmative showing that Mr. Ledoux's inculpatory statements were freely and voluntarily given

and not the product of fear, duress, intimidation, menaces, threats, inducements, or promises. Thus, the trial court's denial of Mr. Ledoux's motion for new trial was in error.

## *Post Conviction Claims*

## CLAIM NO. 3 Part A & B

### Ineffective Assistance Of Counsel

### LAW AND ARGUMENT

Denial of effective assistance of trial counsel standards established under *Strickland v. Washington*, supra, adopted standards by the State of Louisiana under *State v. Fuller, supra;*

Two Part Test:

A. Counsel's performance was deficient; and

B. Deficiency prejudiced relator.

Part 2

Counsel's performance was deficient; relator's counsel, Gregory T. Akers, conduct committed before and during trial so undermined proper functioning of Adversarial Process that relator's trial cannot be relied upon as having produced a just result as guaranteed by the U.S. Constitution under the 6th Amendment (Right to Counsel) and the Louisiana State Constitution under Article 1 Section 13 (Right to Counsel).

Specific Conduct Includes:

I)      On 10/31/13, relator's counsel enters pleas of *Not Guilty* and *Not Guilty By Reason Of Insanity.* Dr. Michael Garriage and Dr. Rafael F. Salcedo were ordered by the court to examine relator on 11/05/13. Both doctors' reports were submitted and filed with the counsel by

12/18/13 and 01/16/14. Two Lunacy hearings were scheduled then re-scheduled. On 3/06/14, Counsel withdrew relator's plea of *Not Guilty By Reason Of Insanity* without relator's knowledge or consent. Both reports were sealed by court order and has yet to be examined by anyone who can make a just determination as to whether or not relator was competent enough to proceed/understand the nature of the proceedings that he was forced into to assist in his defense.

In light of the following facts, it is clear that relator had absolutely no understanding of the proceedings or he would have at the very least brought to the court's attention how counsel repeatedly failed to advocate his cause. Considering all that he was about to loose any sane man would have objected.

II)   Relator's counsel failed at any time, before or during trial, to file a motion to quash the indictments in past or in whole. Prior to trial or during trial when it was discovered by counsel that three (3) of the witnesses against him would not be afforded the opportunity to confront and cross examine these witnesses. Counsel had a duty to his client to file a motion to quash these indictments in part or in whole to prevent the conviction of his client without the opportunity to test the credibility of these witnesses, to cross-examine these witnesses, to adversarial test the states ability to convict his client, as envisioned under the United States Constitution Amendment 6, effective assistance of counsel, confrontation clause/compulsory process and the Louisiana State Constitution Article 1, Section 16. As defined by the United States Supreme Court in *Strickland v. Washington*, *supra*; *Crawford v. Washington*, 124 S.Ct. 1354 (U.S. Wash. 2004); *Davis v. Alaska*, 415 U.S. 308 (1974); *California v. Green*, 399 U.S.

12

149 (1970). Said standards adopted by the Louisiana Supreme Court in *State v. Fuller*, *supra*, *State ex rel. Nicholas v. State*, 520 So.2d 377 (La. 1988); *State v. Hilliard*, 398 So.2d 1057 (La. 1981); and codified at LSA-C.E. Art. 607(c).

Considering that relator was found guilty as charged (except one armed robbery, was found guilty of attempted armed robbery, count 10) in relation to these 3 witnesses without being afforded any opportunity to confront/cross-examine them, this cannot be simply viewed at trial strategy of his client's rights to a fair and impartial trial as guaranteed by the 6th Amendment to the United States Constitution and the Louisiana Constitution Article 1, Section 16.

III)   Counsel failed to object to the placement, by the court of a jury member not selected by due process. While going through the Second Prospect of prospective jurors, Juror #130 Charlotte Landry was present but for some unknown reason was skipped over by the process and the prospective Juror #51 Brian Cook, who was after Charlotte Landry (#14 and 15) was appointed as the Second Alternate.

Now it could and most likely will be said that this had absolutely no impact on the verdict rendered against relator. And that statement would be absolutely right, other than bringing the jury back in and cross-examine them to determine whether or not Brian Cook had any impact on the verdict during the course of relator's three days of trial, May 12th to May 15th, 2014.

But to all such practice undermines the integrity of the court, taints the judiciary with the stench of foul play.

13

For counsel who allows such practice to go unchallenged, could this court honestly say that counsel Gregory T. Akers acted in his client's best interest or, just acted?

Relator would like to point something out that might account for Mr. Akers actions as counsel. This matter was adjudicated in the eyes of the law presumed fact.

*In re Gregory Thomas Akers*, No. 2016-13-0510 dated April 15, 2016, cited as 189 So.3d 384.

It seems, according to the facts discovered by the Office of Disciplinary Counsel (O.D.C.) that Mr. Akers has a problem with driving under the influence of alcohol. He then provided false and misleading information to an administrative law judge and to a clinical psychologist regarding the circumstances of his arrest.

Prior to [and no doubt after receiving sound counsel from his counsel] the institution of formal charges, he and the O.D.C. submitted a joint petition for consent discipline.

Now, as yet, relator has been unable to obtain the facts of his arrest, for all we know this could have happened the very day of relators trial. When and if relator does receive facts related to this arrest, relator wishes to preserve this issue/claim if it is one, until that time.

IV)   Relator's other counsel, Timothy Yasbeck who had a limited role in relator's defense according to the record, failed to impeach the State's star witness Andrea Mendoza. The only witness who identified relator in open court in the presence of the jury, by color of his eyes, was relator's eyes were actually dark green/brown.

In Ms. Mendoza's statements given to the police she identified two African-American males who committed these crimes. At absolutely no time prior to the trial did she inform

14

anyone that either one of the African-Americans had "greyish light-blue, almond shaped eyes". (TT. Pgs. 39-240).

Mr. Yasbeck reminded Ms. Mendoza of the reports (TT. Pg. 244) and she admits that in her report to the police that she did state that they were African-American. This line of questioning and apparently the defense of his client, his duty, ended.

What type of counsel envision a trial strategy that would allow the State's star witness, the only person who can identify relator by the color of his eyes, change her statements in open court in the presence of the jury condemning his client without any type of objection, declaration of a hostile witness, more to impeach, question her as to why she would change her statement, why she failed to mention this alleged fact until the first day of trial? He did none of this, his other counsel, Mr. Akers. Also had absolutely nothing to say about this new and condemning identification.

V)     Both counsel['s failed to pursue the matter of their client being drugged by law enforcement officer Det. Randy Loumiet who had admitted on the stand that:

1. Relator had been placed under arrest;

2. That relator had been read and understood his Miranda rights and that he signed a form acknowledging his understanding of his rights;

3. That relator had denied any knowledge or involvement in his first statement to Det. Michael Rippol, Jr. and Sgt. Lance Vitter of any crime; and

4. That while relator was in custody, Det. Loumiet admitted to giving relator contraband (i.e., cigarettes) in violation of R.S. 14:402 – Introducing contraband to a penal institution. Not only did he provide this contraband, he paid for them out of his own income and had somehow extracted a confession from an individual who was already under stress from multiple police tactics, mutual threats of what could or would happen

to himself and his family, with or without making a confession, threats on video, during interrogation. An individual who had supposedly committed this crime 4 weeks prior to his arrest, and after his first denial of any knowledge, wrongdoing, or connection to any criminal activity. Relator was prepared to throw his life away a 90 minute smoke break with Det. Loumiet? TT. Pgs. 440-455, such action brings to mind one question: what was in the cigarettes?

Considering relator cannot prove that any law enforcement officer ad placed any type of

drug in the free cigarettes, relator must first examine the "Why" of Det. Loumiet's actions and

"What" he expected to accomplish, and "How".

1. An arrest had been made, relator was already in custody and previously questioned by two other law enforcement officers;

2. Relator had denied any knowledge of this alleged criminal activity;

3. This alleged criminal activity had no identifiable perpetrator and absolutely no evidence to connect relator to this crime; and

4. Relator was connected to this crime by an informant who was arrested on an unrelated crime, who was on parole at the time of his arrest and who had an intimate firsthand knowledge of how the system worked and fully understood that he could undermine the system by implicating a third party, namely relator, and increase his chances of being released or alleviating any sentences he might receive, all of which happened.

Furthermore, this informant, Colby Savious, happens to be the same height and has blue

eyes, as identified by the State's star witness Andrea Mendoza.

5. Without a confession, all Det. Loumiet and the State had was a criminal pointing the finger at someone who knew he could pass as the perpetrator and walk away knowing he had just committed another crime and claimed another victim.

There can be absolutely no doubt as to the "Why" Det. Loumiet was compelled to

induce a confession by abusing relators addictive nature. Det. Loumiet cannot claim that he

was unaware of relator's physiological and psychological drug dependency when all he had to

16

do was pull relators prior arrest and conviction for possession of a Schedule II narcotic-oxycodone on August 14, 2012 in Docket Number 523904 of St. Tammany Parish. The rest was easy "What" he expected was to close this case against relator and he knew exactly "How" to do it.

Based on Exhibits "B" which is an Article printed in the New York Times entitled "*Nicotine: Harder to Kick...than Heroin*".

A 48 page study conducted by no less than a dozen doctors and research institutions. Scientist have known for years that "Nicotine is as addictive as heroin, cocaine, or amphetamines, and for most people more addictive than alcohol." This report has noted that "smoking is a subject of compulsive behavior in which the controlling factor nicotine, profoundly affects the smokers central nervous system, producing pleasurable effects, dependency, and when it's taken away, Withdrawal."

The report further notes that "Heroin, cocaine, alcohol, amphetamines and nicotine [...] have many things in common. They affect the nervous system through different routes, but their end results are similar: people become dependent on them."

And like all drug addicts, they exhibit traditional behavior and do things that an uninhibited person would not do. Example: Just hand over their lives to a total stranger, no, if relator did confess, he was telling his only available drug dealer what he wanted to hear.

This report goes on for 48 pages of clinical results of the addictive nature of psychological and physiological similarities to what most people consider "hard" drugs and alcohol, the bottom line is that Det. Loumiet cannot offer any reasonable explanation as to why

he would invest his own money into a man just arrested, invest into an individual in his custody, or explain why he would be willing to break the no-smoking rules of St. Tammany Parish and also introduce contraband to a prisoner. The only logical explanation is that he knew he was dealing with an addict, he knew possession of a known drug, he had unsupervised access with this prisoner. He could peddle this drug to his victim and convince him to commit a life condemning act against himself. Under LSA-C.Cr.P. Art. 703(D), "Before a confession can be introduced into evidence it must [be] affirmatively shown that it was freely and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. Confessions obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, are voluntary and inadmissible as a matter of constitutional law.

The Louisiana 1ˢᵗ Circuit Court of Appeal also said in *State v. Hernandez*, 432 So.2d 350 (1983):

> "A trial court must consider the totality of the circumstances in determining whether or not a confession is admissible."

Could it be said that Det. Loumiet extended an improper influence through relator's addiction to obtain essentially a death inducing confession? Relator has 5 life sentence plus 275 years, under current law in the State of Louisiana which is a long term death sentence.

In *State v. Sims*, 310 So.2d 587 (La. 1987) and *State v. Washington*, 540 So.2d 502 (1ˢᵗ Cir. 1989), it was noted that: That direct testimony of the interviewing Police Officer, Det. Loumiet, in this matter freely admitted that he extended an improper influence upon relator

through his drug dependency and used that weakness to obtain a statement from an unstable individual who could not understand the danger he faced by puffing on cigarettes freely provided by the man who was going to condemn him for the rest of his natural life. (TT. Pgs. 440-455).

Both counsel's performance and conduct was absolutely deficient to the point of completely undermining the proper adversarial process that is guaranteed by the U.S. and State Constitutions. Said deficiency prejudiced relator when he lost his life, liberty and freedoms protected by the U.S. and State Constitutions and suffered the onus taint of conviction absent a proper and just adversarial testing of the State's case against him.

All claims raised within the claim of ineffective assistance of counsel that are of U.S. and State Constitutional nature are raise as individual claims.

## CLAIM NO. 4

**Confession obtained through fear, threats and promises which violated the 5th and 14th Amendments to the United States Constitution Due Process Clause.**

**Confession was involuntary, given only through fear from threats made by St. Tammany Parish Detectives, along with the premises that rebutted those threats.**

## LAW AND ARGUMENT

United *States v. Mitchell*, 502 F.3d 931 (C.A. 9 Ariz.) (2007)

Section * 3501(c)

"Allows the government a six (6) hour safe harbor for confessions made while in any law enforcement custody."

Exhibit Page 148, Line(s) 28-32 and page 149 line(s) 1-32 and page 150, line(s) 1-8.

Show that I was arrested around 17:08 (5:08 PM), when I was actually arrested around 3:30 PM, because I was placed in handcuffs and seated in a police car for about one and one half hours on the street. Police radio traffic would agree with this. Exhibit (C) Page 133, line(s) 17-27.

This shows that I was not read my rights until almost midnight. Hours after the arrest. I was taken outside, off-record, for a smoke break shortly after 12:00 AM (Midnight). This smoke break last for 90 minutes. My confession was not made until 2:00 AM, in the morning. More than 9 hours after my arrest.

This involuntary confession was obtained hour(s) over the Federal and United States Constitutional time limits handed down in *U.S. v. Mitchell*, *supra*. Violating relator's constitutional right, demanding a new trial, under an inadmissible confession.

*State v. Bernard*, held, "The state will not be allowed to prevail against proceedings handed down from the U.S. Supreme Court."

This involuntary confession was not only hours over the constitutional limit, but made through threats, fears and promises.

*Watts v. State of Indiana*, 60 S.Ct. 1347, 338 U.S. 49 (U.S. Ind. 1949) held that "There is a torture of mind as well as body; the will is much affected by fear as by force: and there comes a point where this court should be ignorant as judges of what we know as men."

*Watts v. Indiana* also held: * 1350, that "A confession to be voluntary of course need not be volunteered, but if it is the product of sustained pressure, no matter how slight, by police

it does not issue from a free choice when a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the Suction Process of interrogation and therefore of voluntary."

To show an example of the mental threats and fear put into relator by Detectives' interrogation look at Exhibit (C) Page 139, line 4.

Again, more mental intimidation and seeds of fear being planted into the relator's mind on Exhibit (C) Page 140, line(s) 1-19.

Let's look at: *Colombe v. Connecticut*, 81 S.Ct. 1860, 367 U.S. 568 (U.S. Conn. 1961) Section * 1863 and 1864 [367 U.S. 575] states:

> "This they may accomplish not only with ropes and rubber hoses,
> not only by relay questioning persistently, insistently subjugating a
> tired mind, but by subtler devices."

Now there are two (2) separate videos from the confession and interrogation room. The video before the actual confession must be reviewed again more carefully. Where the 2nd video of the actual confession has been stealing the focus of review for too long. While threats and intimidation clearly seen on video have been prejudicially overlooked. If the threats would of favored states argument, there would be no prejudice.

Look at Exhibit (C) Pages 133-137, and compare the questions and answers to the questions and answers from Detective on Page(s) 141-143.

After finding that the Detectives were allowed to make comments like:

"You have to make a choice, to either "play hard-ball", and spend the rest of your life in prison,

or you can "man-up" and get a slap on the wrist. (Video).

"When you go before a jury, do you want them to see someone who confessed, and is showing remorse, or someone who has no remorse? I think the person showing remorse would get more sympathy during sentencing." (Video).

Along with multiple other comments pertaining to my younger brother being in custody, my girlfriend being in custody, my cousin being in custody and my one year old daughter going into O.C.S. State custody, and multiple other mental threats and implying scenarios. (Video). On pages 133-137 of Exhibit (C), you noticed Detective gave evasive answers, denied, lied, and avoided having to answer questions he knew would support the defense argument.

Then on pages 141-143, you will see relator was telling the truth and Detective was uncredible. This motion to suppress should have been granted, solely on the uncredibleness alone, at the very least, not be allowed to be a State witness during trial.

Motion was denied without reason, even after defense showed great doubt in State's argument. Exhibit Page 184, Line 13.

After I've shown this Court that this involuntary confession was obtained over the Federal and Constitutional time limit of six (6) hours, declared in *U.S. v. Mitchell, supra.*

I have also provided evidence to this Court that relator endured multiple implication and threatening remarks, and scenarios from detectives.

After you have received these facts you must ask yourself was this the person who was booked into the parish jail on one single count of home invasion as promised? Who was allowed to watch his family leave? Who was out of custody interrogation for 90 minutes? Who

22

believed he had to confess in order to get the "Slap on the wrist, and sympathy from the jury" as told by detectives, on video confession? Or was this a person who freely, voluntarily under no stress or fear made a confession knowing his family would be in trouble with authorities, relator's younger brother remained in Police custody for a period of one year, knowing he would receive 5 life sentences and 275 years in prison?

You must ask yourself, how would you interpret these remarks from detectives.

Exhibit Pages 153, Lines 14-32, Page 155, Lines 2-9.

Finally, *Colombe v. Connecticut, supra,* held "In Hawkins words, a prisoner is not to be made the deluded instrument of his own conviction." 2 Hawkins, *Pleas of the Crown* (8th ed. 1824, 595).

After presenting ample evidence that relator was under stress, fear, intimidation and suffered disturbing remarks by detectives. How can it be said that the credibility goes to the officer. When the officer obviously lied, manipulated and evaded questions? How can it be said all circumstances were taken into consideration when making a ruling on this Motion to Suppress if the record proves the **only credible witness** who gave testimony in this suppression hearing relator himself?

WHEREFORE, Petitioner contends his conviction and sentence must be dismiss based on the violation of his United States Constitutional rights.

## CLAIM NO. 5 A & B

**Bias and Prejudice Juror was allowed to cast vote, and hindered a fair and constitutional verdict from jury, violating 5th and 14th Amendments.**

**Relator does not have his complete record.**

## LAW AND ARGUMENT

A.     Juror made bias remarks so prejudicial to relator's trial, it cannot be said his jury was constitutional. When juror made the statement in Voir Dire that he "Would Not" find the defendant "Not Guilty" unless relator took the witness stand during trial.

Relator's counsel refused him the privilege of taking the stand, even after several request.

According to this bias Juror's statement, "<u>The juror cast his vote of "Guilty"</u>", before trial ever began. Before he heard any facts, events, or evidence of the case. This bias Juror's actions so prejudices relator's right to a fair trial, his guilty verdict by juror cannot stand, and relator request to have the video from the jury's deliberation provided and transcribed to find out what kind of statements this juror made to other jurors, contaminating there better judgment and directing the opinions to follow his already bias and prejudicial opinion of relator, which this juror made crystal clear before relator's trial even began. Relator must apologize for not being able to provide more specific information in this matter, but now wishes to go on record that which clearly shows the prejudice applied to relator's right to obtain <u>any and all records</u> to make a proper and constitutional attack upon his conviction and sentence. It is a great prejudice to relator, who has several other claims he wishes to raise but is being denied his U.S. and State

24

Constitutional rights to. Supported by LSA-R.S. 44:1; La. Const. Art. 7, Section 3; LSA-R.S. 44:31; LSA-R.S. 44:31.1; La Const. Art. 1, Section 22, LSA-R.S. 44:35, and LSA-R.S. 44:32.

Relator will pay for any fees necessary, he simply wishes to obtain the records and be sent the bill for any fees. To grant him his constitutional rights to obtain and review any and all records, evidence against him while continuing to prepare an attack upon his conviction and sentence.

B.    Relator has filed several motions to produce documents and also made several request in letters to the clerk of court and the court minute reporter.

As of this date, relator is not in possession of the Voir Dire and Closing Arguments from trial, Entire Discovery (Police reports, witness statements, co-defendant's statements, and confidential informant statements) and no reply to multiple request to have a prison (recorded telephone call related to conviction transcribed. Courts claim Attorney Greg Akers had the discovery. Mr. Akers claims he gave everything he had to my attorney, Mark D. Plaisance, which I obtained from the Louisiana Supreme Court. Mark Plainsance claims all the records I'm requesting were never given to him by Greg T. Akers.

Point of this matter is relator does not have them and has had no opportunity to review the record. The State should be required to submit a certified copy of the State court record, including transcripts of all proceedings held in the State courts; a certified copy of all documents, including all briefs or memoranda of any party, filed in connection with any appeal, application for post conviction relief, or writ application presented to any and all State district courts, appellate courts, or the Louisiana Supreme Court; and certified copies of, or citations to,

all State court dispositions, including the Louisiana Supreme Court decision pertaining to the underlying conviction.

Petitioner is requesting that he is provided a copy of the afore listed documents in order to properly review and file a challenge to his conviction and sentence. Documents which he has not been afforded an opportunity to review.

### *Supplemental Post Conviction Claims*

## CLAIM NO. 6

**Petitioner's 14th Amendment Due Process Right To Stand Trial While Legally Incompetent Was Violated.**

### LAW AND ARGUMENT

The Fourteenth Amendment's Due Process Clause protect an individual's right not to proceed to trial while legally competent. See *Medina v. California*, 505 U.S. 447, 449, 112 S.Ct. 2572, 2579, 120 L.Ed.2d 353, 365-66 (1992) (quoting *Drope v. Missouri*, 420 U.S. 162, 173, 95 S.Ct. 896, 904, 43 L.Ed.2d 103, 114 (1975)); *Pate v. Robinson*, 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815, 822 (1966). An incompetent defendant's due process right to stand trial does more than preserve the defendant's rights; it protects society's interest in the reliability of criminal adjudications. See Richard J. Bonnie, *The Competence of Criminal Defendants: Beyond Dusty and Drope*, 47 U.Miami L. Rev. 539, 53,542 (1993). Where a defendant with a severe mental illness is unable to meaningfully assist counsel, but is nevertheless compelled to stand trial, each of the countless decisions in which he is involved is called into question, and the reliability of the judicial proceeding is impaired.

In Louisiana, the prohibition against subjecting an incompetent individual to a criminal

trial "is codified in law which directs the suspension of criminal proceedings against one found

to be mentally incompetent." *State v. Bennett*, 345 So.2d 1129, 1136 (La. 1977) (on rehearing).

LSA-C.Cr.P. Arts. 642-648. Louisiana's statutory scheme for detecting mental incapacity

jealously guards a defendant's right to a fair trial. *Nomey*, 613 So.2d at 161. In Louisiana's

"mental incapacity to proceed exists when, as a result of mental disease or defect a defendant

presently lacks the capacity to understand the proceedings against him to assist in his defense."

LSA-C.Cr.P. Arts. 641. In Louisiana, there is a presumption of sanity, and before the court is

required to appoint a sanity commission, the defendant has the burden to establish his

incapacity to stand trial by a clear preponderance of the evidence. See LSA-R.S. 15:432; *State*

*v. Bridgewater*, 00-1529, p. 6 (La. 1/15/02), 823 So.2d 877. The Louisiana Supreme Court has

determined that the defendant bears the burden of proving by a preponderance of the evidence

his incapacity to stand trial. *State v. Armstrong*, 671 So.2d 307, 309 (La. 4/8/96). The

procedure for raising the issue of a defendant's competency is set forth withing. LSA-C.Cr.P.

Arts. 642: The defendant's mental capacity to proceed may be raised at any time by the defense,

the district attorney, or the court. When the question of defendant's mental incapacity to

proceed is raised, there shall be no further steps in the criminal prosecution, except for the

institution of prosecution, until the defendant is found to have the mental capacity to proceed.

Next, La. C.Cr.P. Art. 643 provides, in pertinent part, "the court shall order a mental

examination of the defendant when it has reasonable ground to doubt the defendant's mental

capacity to proceed." Last, if a defendant's mental incapacity has been properly raised, the

proceedings can only continue after the court holds a contradictory hearing and decides the issue of the defendant's mental capacity to proceed. See La. C.Cr.P. Art. 647. *State ex rel Seals v. State*, 2000-2738 (La. 10/25/02, 831 So.2d 828, 832-33.

*Petitioner properly raised mental capacity and until his capacity to stand trial was resolved all proceedings should have stopped.*

Petitioner properly raised the issue of his mental capacity to proceed to trial at arraignment when he plead *not guilty and not guilty by reason off insanity* to all counts on October 31, 2013.[1] On November 5, 2013, Nick Noriea, Assistant District Attorney on the case, filed a Motion to Appointment of Sanity Commission in this case. On that same day, this Honorable Court granted the Motion for Appointment of Sanity Commission and appointed Doctors Michael Garriaga and Rafael Salcedo to examine Petitioner. Both Doctors examined Petitioner and filed their reports to the court, in which, was sealed on December 18, 2013, and January 16, 2014.

Petitioner's Lunacy Hearing was postponed several times. On March 6, 2014, Petitioner counsel withdrew the plea of *not guilty and not guilty by reason of insanity* to a plea of *not guilty*. The Lunacy Hearing was not held and Petitioner proceeded to trial and was found *guilty*.

Petitioner's counsel should not have been able to withdrew his plea of *not guilty and not guilty by reason of insanity.* To allow the plea to be withdrawn, is considered a further step in the prosecution, and it removes the ultimate decision regarding competency from the trial court. See *State v. Carney*, 25,518 (La. App. 2nd Cir. 10/15/95). After the judge granted the

---

1    See attached Minute Entry of Thursday, October 31, 2013 as Exhibit

State's Motion to Appoint a Sanity Commission and appoint Doctors Garriaga and Salcedo to examine Petitioner, all proceedings should have been stopped. See La. C.Cr.P. Art. 647. It is plain to see that the trial court had reasonable ground to doubt Petitioner's capacity to proceed, because of the appointment of the Sanity Commission. See *State v. Strain*, 42,809 (La. App. 2nd Cir. 12/05/07) 972 So.2d 1184.

Indeed, it would be contradictory to simultaneously argued that a defendant may be mentally incompetent to proceed and that he may also knowingly and intelligently waive his right to have the trial court determine his competency to stand trial. *State v. Harris*, 40 So.2d 128 (La. 1981). The trial court did not conduct the Lunacy Hearing to decide whether Petitioner had the mental capacity to proceed as required by La. C.Cr.P. Art. 647. Had the trial court made the determination that is was supposed to have made under La. C.Cr.P. Art. 647, Petitioner's competency to stand trial would have been resolved. Without making that decision, Petitioner's Due Process right to not stand trial while legally competent was violated.

In *Snyder*, the record gave no basis upon which a reviewing court could determine if the trial court properly inquired into the defendant's competency. Factors which a court may consider to conduct a proper inquiry are known as the *Bennett* factors and include:

> Whether the defendant is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable to testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. See *State v. Bennett*, 345 So.2d 1129, 1137 (La. 1977).

It is plain to see from the minute entries in this case, that there is no evidence that the trial court considered any of the *Bennett* factors after Petitioner's competency was raised. What is proven from the evidence that Petitioner has provided is that he plead *not guilty and not guilty by reason of insanity*, the A.D.A. filed a motion for the appointment of a sanity commission, the trial court granted the motion and assigned Doctors Garriaga and Salcedo, they turned their findings in to the court and Petitioner's attorney withdrew his plea. There is no affirmative evidence that the trial court conducted any investigation into Petitioner's sanity other than signing the order for the appointment of a sanity commission.

### *Nunc Pro Tunc or Nullification*

Where there is a bona fide question raised regarding a defendant's capacity, the failure to observe procedures to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial. *Drope* at 172, 95 S.Ct. 896; *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *State v. Rogers*, 419 So.2d 840. At this point, the failure to resolve the issue of a defendant's capacity to proceed may result in nullification of the conviction and sentence under *State v. Nomey*, 613 So.2d 157, 161-162 (La. 1993), or a nunc pro tunc hearing to determine retrospectively under *State v. Snyder*, 98-1078 (La. 4/14/99), 750 So.2d 832.

In certain instances, a nunc pro tunc hearing on the issue of competency is appropriate "if a meaningful inquiry into the defendant's competency" may still be had. *Snyder* at 854. In such cases, the trial court is again vested with the discretion of making this decision as it "is in

the best position" to do so. *Id.* at 855. This determination must be decided on a case by case basis, under the guidance of *Nomey*, *Snyder*, and it's progeny. *Id.* The State bears the burden in the nunc pro tunc hearing to provide sufficient evidence for the court to make a rational decision. *Id.*

A meaningful determination includes consideration of the existence of contemporaneous medical evidence, the recollections of non-experts when had the opportunity to interact with the defendant during the relevant period, statements by the defendant in the trial transcript, and the existence of medical records. If sufficient contemporaneous information is available. See *Snyder*, *supra.*

Petitioner asserts that the only recorded evidence that exist that could possibly be sufficient enough to hold a nunc pro tunc hearing is the sealed reports of Doctors Garriaga and Salcedo, if those reports are still apart of the record. Petitioner did not take the stand at his trial and there exist no other medical records to determine Petitioner's competency. It is almost impossible for a nunc pro tunc hearing to be held in this situation because there is not ample enough evidence for the court to determine his competency doing the period leading to trial.

Since there is not enough evidence to determine Petitioner's competency then a nullification of his conviction and sentence is required. As the Petitioner stated above there is not enough evidence in the record to determine Petitioner's competency and his Fourteenth Amendment Due Process right was violated when the trial court allowed his attorney to withdraw his plea of *not guilty and not guilty by reason of insanity* and proceeded to trial.

31

WHEREFORE, for the foregoing reasons, this Honorable Court should nullify the conviction and sentence as a matter of law.

## CONCLUSION

Petitioner has exhausted all state court remedies, and now seeks long overdue relief from this Honorable Court. 28 U.S.C. § 2254 provides in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

For the foregoing reasons, Petitioner Beau Ledoux respectfully requests that this Honorable Court grant consideration to his claims. He was wrongfully convicted of five counts of violating R.S. 14:44, Aggravated Kidnapping; four counts of violating 14:64, Armed Robbery with a Firearm; and one count of attempting to violate 14:64, Armed Robbery with a Firearm, and sentenced to five terms of life imprisonment as to his convictions for violating R.S. 14:44, Aggravated Kidnapping. Additionally was sentenced following a multiple adjudication, to sixty-years of imprisonment as to each of his convictions of violating R.S. 14:64, Armed Robbery with a Firearm; and to thirty-five years of imprisonment as to his conviction of attempting to violate R.S. 14:64, Attempted Armed Robbery with a Firearm.

28 U.S.C. § 2254 further provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Petitioner herein submits claims to this Honorable Court based on egregious violations of his constitutional rights, and thus requests the granting of this petition under 28 U.S.C. § 2254(d)(1) and (2). Relief is specifically requested to vacate his conviction and sentence and order him released from custody. Petitioner humbly beseeches this Honorable Court for long-overdue consideration of the constitutional violations raised herein.

**WHEREFORE**, Petitioner prays that this Honorable Court grant his *Petition for Writ of Habeas Corpus* and reverse the decisions of the Louisiana Supreme Court, the Louisiana First Circuit Court of Appeal, and the trial court, and grant relief to which he may be entitled. All claims alleged herein are based on clear violations of Petitioner's constitutional rights and Petitioner requests that this Honorable Court consider this petition pursuant to the mandate of 28 U.S.C. § 2254.

Respectfully submitted this ___16th___ day of ___November___, 2021.

Beau Ledoux #601377
Camp C Bear 4
Louisiana State Prison
Angola, Louisiana 70712

## REQUEST FOR RESPONSE

Based on the claims presented in Petitioner's Application for Writ of Habeas Corpus, it is requested that the Respondent is ordered to provide this Honorable Court with the following information:

1.    An answer to the Petitions.

(a)    The answer shall state whether Petitioner has exhausted State remedies, including any post-conviction remedies available to him under Louisiana law, by properly presenting to the Louisiana Supreme Court all issues raised in this petition. If Respondent claims that Petitioner has failed to exhaust his State remedies, Respondent shall state whether Petitioner has any available procedural vehicle by which he may present his claims to the State courts, and if not, Respondent shall present applicable case law as to whether this Court should reach the merits of the claims. If Respondent contends that Petitioner has procedurally defaulted on any ground presented in this petition, Respondent should raise the defense of procedural default.

Respondent shall also address whether the claims presented herein are cognizable on federal habeas review. If they are not cognizable, Respondent shall present applicable case law as to why the claims are not properly reviewable by this Court.

Respondent must also state whether Petitioner demonstrates that any of the claims presented here have been adjudicated in State court proceedings that result in: (1) a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. See U.S.C. § 2254(d), as amended by § 104(d) of the AEDPA.

Respondent shall also state whether Petitioner has rebutted by clear and convincing evidence any factual determination made by a State court and which is presumed to be correct in this proceeding. See U.S.C. § 2254(e)(1), as amended by § 104(e) of the AEDPA.

(b)    In the event Respondent contends that it has been prejudiced in its ability to respond by Petitioner's delay in filing or that the petition is a second or successive petition under 28 U.S.C. § 2254, Respondent shall set forth such contentions with particularity.

(c)    Respondent is further ordered to specifically address whether the filing deadlines contained in 28 U.S.C. § 2244(d)(1) (as amended by Section 101 APEDA) are applicable to this proceeding and bar review of Petitioner's review.

2.    A memorandum of law in support of all issues raised in the answer, citing all relevant Fifth Circuit authority and referring to the pertinent page numbers in the State court record in support of the answer. A COPY OF THE BRIEF FILED IN STATE COURT WILL NOT BE DEEMED SUFFICIENT IN THIS PROCEEDING.

3.    A certified copy of the State court record, including transcripts of all proceedings held in the State courts.

4.    A certified copy of all documents, including all briefs or memoranda of any party, filed in connection with any appeal, application for post conviction relief, or writ application presented to any and all State district courts, appellate courts, or the Louisiana Supreme Court.

5.    Certified copies of, or citations to, all State court dispositions, including the Louisiana Supreme Court decision pertaining to the underlying conviction.

Respondent should be required to provide the Magistrate Judge with a paper copy of all exhibits filed using CM/ECF. The pages of the record shall be arranged in chronological sequence and securely bound together and numbered consecutively. An index describing each item submitted and showing each item's page number shall also be filed/attached.

In the event the Respondent is unable to produce any of the above documents, Respondent shall advise this Court in writing why Respondent is unable to produce them.

Respectfully requested:

Beau Ledoux #601377

## AFFIDAVIT / CERTIFICATE OF SERVICE

I do hereby swear and affirm that the foregoing is true and correct to the best of my knowledge and belief.

I do hereby certify that the foregoing has been served upon:

Opposing Counsel

**Warren Montgomery, District Attorney**
**701 N. Columbia Street**
**Covington, Louisiana 70433**

by placing a copy of same in a properly addressed envelope into the hands of the Classification Officer assigned to my unit along with a Drawslip made out to the General Fund, LSP, Angola, Louisiana 70712 for the cost of postage and a properly filled out Inmate's Request for Indigent/Legal Mail form, receiving receipt for same in accordance with the institution's rules and procedures for legal mail.

Done this 16th day of November, 2021.

Beau Ledoux #601377